# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| In re:<br><br>PREMIER CAJUN KINGS, LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 23-00656-DSC |

## DECLARATION OF DAVID M. BAKER
## IN SUPPORT OF FIRST-DAY MOTIONS

I, David M. Baker, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the contents of this Declaration in Support of First-Day Motions are true and correct.

## BACKGROUND

1.  I, David M. Baker, am over 21 years of age and am competent to testify to the matters set forth herein. I am the Managing Partner of Aurora Management Partners Inc., a Georgia Corporation ("Aurora"). Aurora is a financial consulting and advisory firm that specializes in providing crisis and turnaround management consulting to distressed companies. On or about June 2, 2022, Aurora was engaged by Premier Cajun Kings, LLC ("PCK" or the "Debtor") to provide certain financial and business advisory services. Since Aurora's engagement, I have been actively involved in evaluating the Debtor's liquidity, cash management system, financial forecasting, and contingency planning. On July 22, 2022, I was appointed as the Debtor's Chief Restructuring Officer ("CRO"). In my capacity as CRO, I am intimately familiar with the day-to-day operations of the Debtor, its business and financial affairs, and books and records. I am a graduate of the University of North Carolina at Chapel

---

[1]  The Debtor in this Chapter 11 case and the last four digits of its federal tax identification are Premier Cajun Kings, LLC (3157). The Debtor's corporate headquarters is located at 7078 Peachtree Industrial Blvd. Suite #800, Peachtree Corners, GA 30071.

Hill with a degree in accounting. I have over forty years of diversified business experience in restructuring, financial management, and accounting. I have extensive experience in the development of reorganization plans, creditor negotiations, business plan preparation and long-term forecasting, developing and implementing cost reduction programs, and financial management of public and privately held companies. I have advised companies, boards, investors, and lender groups and served in interim management roles and led assignment in numerous districts.

2. I submit this Declaration in support of the Debtor's chapter 11 petition, first-day applications, and motions described below (collectively, the "First-Day Motions"). To enable the Debtor to operate effectively and minimize potential adverse effects in this chapter 11 case, the Debtor has requested certain relief in the First-Day Motions. The First Day Motions, summarized below, seek, among other things, to (a) obtain the Court's authorization to use its secured lender's cash collateral to continue operations and administer this chapter 11 case; (b) ensure the continuation of the Debtor's cash management system and other business operations without interruption, (c) maintain employee morale and confidence, and (d) implement certain administrative procedures that will promote a seamless transition into chapter 11.

3. Gaining and maintaining the support of the Debtor's employees, vendors, customers, and other key constituents, as well as maintaining the day-to-day operations of the Debtor's business with minimal disruption, will be critical to the Debtor's efforts in chapter 11 and its ability to maximize the recovery prospects for all interested parties. The relief requested in the First-Day Motions is in the best interests of the Debtor and its creditors and is necessary to avoid immediate and irreparable harm.

65534/0001-44644722v3

4.      Except as otherwise indicated, all facts set forth in this Declaration are offered to the best of my knowledge, information, and belief, and are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtor's management or professionals working with me or under my supervision, or my informed opinion based upon my experience and knowledge of the Debtor's industry, operations, and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtor.

5.      This Declaration is intended to provide a summary overview of the Debtor's business and the need for its restructuring pursuant to chapter 11 of the Bankruptcy Code. Section I provides a brief overview of the Debtor's business. Section II describes the Debtor's pre-petition capital structure. Section III describes the circumstances that precipitated the commencement of the chapter 11 case and the Debtor's objectives in the chapter 11 case. Section IV provides a summary of the First-Day Motions and the factual bases for the relief requested therein.

I.      **The Debtor's Business.**

   A.      **Corporate Structure and Governance.**

6.      The Debtor is single-member Limited Liability Company formed under the laws of Alabama. It has a number of affiliates which own real estate leased to Burger King and Popeyes restaurants, and/or operate Burger King restaurants. As of the Petition Date, the Debtor's sole member is Joginder Sidhu, Personal Representative for the Estate of Manrai Sidhu (deceased). The Debtor's fiscal year runs from January 1 to December 31.

   B.      **Overview of the Debtor's Business Operations.**

7.      PCK was founded in 2018 by Manraj "Patrick" Sidhu ("Mr. Sidhu") for the purpose of owning and operating Popeyes restaurants (collectively, the "Restaurants" and, each,

a "Restaurant") as franchisee pursuant to a franchise agreement with Popeyes Louisiana Kitchen, Inc. ("PLKI"). Beginning with six (6) Restaurants in or around Birmingham, Alabama in early 2018, the Debtor later purchased an additional 24 Restaurants throughout Alabama, Georgia, and Tennessee over the course of 2018 and 2019. Operating these 30 Restaurants, the Debtor achieved sales of greater than $30 million in calendar years 2020 and 2021, while employing nearly 500 employees.

8.     Unfortunately, Mr. Sidhu passed away unexpectedly on May 24, 2022, which triggered great operational instability for PCK's existing Restaurants, as Mr. Sidhu was not only the sole member but also sole manager. Upon Mr. Sidhu's tragic death, Joginder Sidhu became the Personal Representative of Mr. Sidhu's estate (the "Estate Representative") and, as such, gained legal and operational control over the Debtor. The Estate Representative hired Aurora on June 2, 2022 to provide financial advisory services, and later engaged me as CRO.

9.     As of the Petition Date, the Debtor continues to operate 19 Restaurants pursuant to a limited license agreement with PLKI (the "Franchise Agreement") that was negotiated prior to the Petition Date specifically for purposes of continuing the operations of the Popeyes restaurants during this chapter 11 case.

**C.     The Debtor's Employees.**

10.     As of the Petition Date, the Debtor has 398 employees (the "Employees"), 28 of whom are on salary (the "Salaried Employees") and 370 of whom are paid hourly (the "Hourly Employees"). The Debtor's employee workforce is comprised of 389 restaurant-level employees, who perform functions necessary to prepare and serve food, receive and stock inventory, and handle daily upkeep. An additional seven (7) employees are Area Directors or Directors of Operation, and two (2) further employees perform maintenance functions. Seventy-

4

two (72) of the Employees work full time. Full-time Employees are those who are regularly scheduled to work at least 35 hours per week (the "Full-Time Employees"). Three Hundred Twenty-Six (326) of the Employees work part time. Part-time Employees are those who are regularly scheduled to work less than 30 hours per week (the "Part-Time Employees").

**D. The Debtor's Recent Financials.**

11. For the fiscal year ending December 31, 2022, the Debtor had sales of $26.0 million and suffered a net operating loss of $6.8 million.

12. As of March 10, 2023, the Debtor's balance sheet reflects assets of approximately $10.0 million and liabilities of approximately $20.1 million.

**II. The Debtor's Prepetition Capital Structure.**

13. On January 7, 2021, Premier Cajun (the "Borrower"), and Manraj Sidhu (the "Guarantor") and PNC Bank, National Association ("PNC") (as successor in interest to BBVA USA f/k/a Compass Bank), as sole Lender ("Prepetition Secured Party") entered into that certain Amended and Restated Credit Agreement (as amended, modified, restated, amended and restated, and/or supplemented from time to time, the "Credit Agreement" and, collectively with all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, deeds, instruments, indemnities, indemnity letters, fee letters, assignments, charges, amendments, and any other agreements delivered pursuant thereto or in connection therewith, including the "Loan Documents" as such term is defined in the Credit Agreement, and the Forbearance Agreement dated May 11, 2022 between Premier Cajun, Guarantor, and PNC the "Prepetition Loan Documents"), which provided the Borrower with an asset-based term loan credit facility ("Credit Facility"). The Credit Facility consists of: (a) a $9,961,077.22 term loan facility ("Term Facility," and such loans thereunder, "Term Loans"), (b)

Case 23-00656-DSC11    Doc 11    Filed 03/14/23    Entered 03/14/23 11:15:34    Desc Main
Document      Page 5 of 27

a $3,000,000 delayed draw term loan facility ("DDTL Facility" and such loans thereunder, "DDTL Loans"), and (c) a $5,000,000 development loan facility ("Development Loan Facility" and such loans thereunder, Development Loans").  The Prepetition Secured Obligations (as defined herein) matured on September 30, 2022, however they shall also be deemed to have been automatically accelerated on the Petition Date as a result of the commencement of the Chapter 11 Case in accordance with the terms of the Prepetition Loan Documents and all commitments of the Prepetition Secured Party have been terminated.  All indebtedness, liabilities, and obligations under the Prepetition Loan Documents, specifically including all "Obligations", (as defined in the Credit Agreement and other Prepetition Loan Documents are referred to herein as "Prepetition Secured Obligations").  Each of the Prepetition Loan Documents to which the Debtor is a party is valid, binding, and, subject to applicable bankruptcy law, enforceable against the Debtor.

14.     PNC has a first-priority security interest in all of the Debtor's assets, including cash and accounts receivable.  As of the Petition Date, the amount outstanding to the Prepetition Secured Party is $8,217,991.27.

**III.    The Need for Chapter 11 Relief and the Events Leading to the Commencement of the Chapter 11 Case.**

**A.     Events Leading to Chapter 11 Filing.**

15.     Like many other businesses, and particularly restaurants, the Debtor has faced significant challenges over the past 12 months, especially the sudden and unexpected passing of its sole member, Mr. Sidhu, on May 24, 2022.  This tragic loss, coupled with various macroeconomic factors, has caused tremendous uncertainty and disruption within the business.  Those factors include, among others, the national impact of the COVID-19 pandemic on

Case 23-00656-DSC11    Doc 11    Filed 03/14/23    Entered 03/14/23 11:15:34    Desc Main
Document      Page 6 of 27

restaurant operations, high inflation, increased borrowing rates, and an increasingly limited qualified labor force.

16.     Due to low performance and increasing losses, the Debtor, with the advice of its professionals, made the difficult decision to close 10 Restaurants throughout Alabama and Tennessee in an attempt to avoid further losses and to stabilize the business (another location was evicted by the landlord).   Unfortunately, these cost-cutting measures have not been sufficient to correct or prevent the Debtor's insolvency.   Facing increased pressure from landlords, vendors, and its secured lender, the Debtor has no choice but to seek relief in this Court in order to reorganize its business in chapter 11.

**B.     Proposed Course of the Chapter 11 Case.**

17.     As reflected in the Debtor's cash flow forecast, the Debtor's business can remain operational as a going concern as long as the Debtor is permitted to use its secured lender's cash collateral.   The Debtor believes that those funds, along with cash-on-hand and revenue generated from its ongoing business, will provide the stability and liquidity needed to achieve a successful result in this chapter 11 case through a sale process.   Without use of these funds, however, the Debtor would ultimately be unable to pay its payroll or purchase supplies and would be prevented from operating its business long enough to market and sell the assets, thus impairing the Debtor's ability to preserve the value of its business and the estate for the benefit of all stakeholders.

18.     The Debtor intends to operate its business during this chapter 11 case while seeking to conduct a prompt sale process.   To that end, the Debtor entered into the Franchise Agreement with the specific understanding by both the Debtor and PLKI that a sale process would be conducted and that the purchaser would then enter into a new franchise agreement with PLKI.

65534/0001-44644722v3

## IV.    The Debtor's First-Day Motions.[2]

19.    Concurrently with the filing of this chapter 11 case, the Debtor filed a number of First-Day Motions.  The Debtor anticipates that the Court will conduct a hearing soon after the commencement of this case (the "First-Day Hearing") to consider the First-Day Motions.

20.    An important and critical element to the success of this chapter 11 case will be the entry of orders granting the relief requested in each of the First-Day Motions.  Generally, the First-Day Motions are designed to facilitate: (a) the continuation of business operations without interruption, and to approve Debtor's use of its secured creditors' cash collateral; (b) preservation of customer and vendor relationships; and (c) maintenance of employee morale and confidence.  The factual background in support of each First-Day Motion is provided below:

        a)    **Motion of the Debtor and Debtor-In-Possession for Entry of Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, and (III) Scheduling a Final Hearing, and (IV) Granting Related Relief (the "Cash Collateral Motion").**

21.    By this motion, the Debtor is seeking interim authorization to use the Cash Collateral (as defined in the Cash Collateral Motion) in order to fund the Debtor's ongoing business operations, as well as the fees and expenses of administering this Chapter 11 case, to the extent approved by the Court.

22.    Entry of the Cash Collateral Orders will significantly contribute to the success of this case by providing the Debtor with the liquidity necessary to preserve its business as a going concern and allow for a sale process to maximize the value of its assets for the benefit of the Debtor, creditors and estate.  The Debtor requires immediate authority to use the Cash Collateral to permit, among other things, (a) the orderly operation of the Debtor's business, (b) the

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the respective First-Day Motions.

65534/0001-44644722v3

management and preservation of the Debtor's assets, (c) the maintenance of the Debtor's business relationships with customers, vendors, and contract parties, and (d) the satisfaction of other working capital and operational needs including the fees and expenses of the chapter 11 case.

23.     The Debtor seeks authority to use $1,710,000.00 million of the Cash Collateral upon entry of the Interim Order, for use during the first two weeks of the case and prior to entry of the Final Order.  Without immediate access to at least $1,710,000.00 million of the Cash Collateral, the Debtor lacks the ability to maintain and continue its business operations and the value of its estate will be irreparably harmed.

24.     Pursuant to sections 361, 362, 363(c)(2), and 363(e) of the Bankruptcy Code and in consideration of the stipulations and consents set forth in the orders, the Debtor has agreed to grant to the Prepetition Secured Party, for the benefit of itself, an additional and replacement valid, binding, enforceable, non-avoidable, and automatically perfected, *nunc pro tunc* to the Petition Date, postpetition security interest in and first priority senior lien ((i) and (ii) below referred to collectively as "Adequate Protection Liens") (i) on the Debtor's post-petition assets which, but for the commencement of the Chapter 11 Case, would constitute Prepetition Collateral in which the Prepetition Secured Party had a valid and perfected security interest as of the Petition Date, and (ii) to the extent of any diminution in the value, from and after the Petition Date, of the Prepetition Secured Party's interest in the Prepetition Collateral ("Diminution in Value") resulting from: (A) any postpetition use of Cash Collateral (including but not limited to the use of any employee retention tax credit funds); (B) the use, sale, or lease of the Prepetition Collateral; and (C) the imposition of the automatic stay (collectively, "Adequate Protection Obligations"), on all of the rights, titles, and interests of the Debtor and its "estate" (as created

65534/0001-44644722v3

pursuant to section 541(a) of the Bankruptcy Code) in, to, and under all property and rights and interests in property of the Debtor of any kind or nature whatsoever in existence as of the Petition Date as well as thereafter created or acquired, and wherever located, including, without limitation, (a) all Prepetition Collateral, (b) all Receivables[3] and all supporting obligations relating thereto; (c) all equipment and fixtures; (d) all general intangibles (including all payment intangibles, tax refunds and employee retention tax credits, and any other refunds, credits or payments of any nature) and all supporting obligations related thereto; (e) all Inventory; (f) all securities, investment property, and financial assets; (g) all real property; (h) all leasehold interests; (*provided*, *however*, that as to a lien on all fee, leasehold, and other real property interests and the proceeds thereof: (I) with respect to non-residential real property leases, no liens or encumbrances shall be granted or extended to such leases under this Interim Order, except as permitted by the applicable lease or pursuant to applicable law, but if any such restriction applies, liens shall then be deemed to extend only to the economic value of proceeds of any sale or other disposition of, and any other proceeds or products of, such leasehold interests; and (II) should Prepetition Secured Party's internal regulatory or compliance requirements require the completion of either or both flood due diligence and obtaining evidence of applicable flood insurance with respect to any real property or leasehold interest, then until completion of such flood due diligence, Prepetition Secured Party shall be deemed to have obtained a lien only on the economic value of, proceeds of any sale or other disposition of such real property interests), (i) all contract rights, rights of payment which have been earned under a contract rights, chattel paper (including electronic chattel paper and tangible chattel paper), commercial tort claims (whether now existing or hereafter arising and whether or not specifically identified), documents

---

[3]     All capitalized terms used in this definition of "Collateral" but not otherwise defined herein shall have the meanings ascribed such terms in the Credit Agreement.

65534/0001-44644722v3

(including all warehouse receipts and bills of lading), deposit accounts, goods, instruments (including promissory notes), letters of credit (whether or not the respective letter of credit is evidenced by a writing) and letter-of-credit rights, cash, certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), security agreements, eminent domain proceeds, condemnation proceeds, tort claim proceeds, and all supporting obligations, including, without limitation, all liquidation and other proceeds, refunds, and supporting obligations under any hedge liabilities; (j) all causes of action whether pursuant to federal or applicable state law, and the proceeds thereof and property received thereby whether by judgment, settlement, or otherwise, other than avoidance actions; (k) upon entry of the Final Order, all claims and causes of action, including proceeds of and property received from such claims and causes of action, under chapter 5 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or state law of the Debtor or its Estate; (l) subject to Paragraph 4(a) of this Interim Order, the Carve-Out Reserve Account and all funds on deposit in the Carve-Out Reserve Account and all other segregated or reserve accounts; (m) if not otherwise described, all of the property or rights in property identified as Collateral (as defined in the Prepetition Loan Documents), (n) all ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by the Debtor or in which it has an interest), computer programs, tapes, disks and documents, including all of such property relating to the property described in clauses (a) through (m) of this definition; and (o) all proceeds and products of the property described in clauses (a) through (n) of this definition, in whatever form (all of the foregoing being sometimes collectively referred to in this Interim Order as "Collateral"). The Adequate Protection Liens are subject or subordinate only to the Carve-Out and Prepetition Permitted Liens, if any. Moreover, the Adequate Protection Liens shall not be subject or

65534/0001-44644722v3

subordinate to or made *pari passu* with (x) any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code, (y) any intercompany claim, whether secured or unsecured, of the Debtor or any domestic or foreign subsidiary or affiliate of the Debtor, or (z) any other lien or security interest under Bankruptcy Code sections 361 or 363 or otherwise except as expressly provided in this Interim Order.

25.     The Prepetition Secured Party is also granted, subject only to the Carve-Out, an allowed superpriority administrative expense claim (the "Adequate Protection Superpriority Claim") as provided for in section 507(b) of the Bankruptcy Code, payable from and having recourse to all prepetition and postpetition property of the Debtor and all proceeds thereof. Subject only to the Carve-Out, and except as provided below, the Adequate Protection Superpriority Claim shall have priority over any and all other administrative expenses pursuant to the Bankruptcy Code (including the kinds specified in or arising or ordered pursuant to sections 105(a), 326, 328, 330, 331, 503(b), 506(c) (subject to entry of a Final Order), 507, 546(c), 552(b) (subject to the entry of a Final Order), 726, and 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment) and all other claims against the Debtor or its estate in the Chapter 11 Case or any subsequently converted bankruptcy case(s) of the Debtor (the, "Successor Case"), at any time existing or arising, of any kind or nature whatsoever.  Other than the Carve-Out, no cost or expense of administration of the Chapter 11 Case shall be senior to, or *pari passu* with, the Adequate Protection Superpriority Claim.

26.     The Debtor shall pay to the Prepetition Secured Party the amount of $25,000 per week for each of the first eight weeks of this Chapter 11 Case (collectively, "Adequate

65534/0001-44644722v3

Protection Payments"). Any and all net proceeds of the sale of any assets of the Debtor shall be paid to the Prepetition Secured Party at closing.

27. As further adequate protection, the Debtor shall pay in cash, without the need for the filing of formal fee applications: (i) immediately upon the closing of a sale of substantially all of the Debtor's assets) the reasonable professional fees, expenses, and disbursements (including, but not limited to, the fees, expenses, and disbursements of counsel and third-party consultants, including financial advisors and auditors) incurred by the Prepetition Secured Party under the Prepetition Loan Documents arising subsequent to the Petition Date in connection with the Chapter 11 Case; and (ii) any other reasonable fees, costs, and expenses incurred by the Prepetition Secured Party under the Prepetition Loan Documents in connection with the Chapter 11 Case.

28. The Debtor shall cooperate with, and to the extent appropriate, comply with all reporting requirements of the Borrower set forth in the Credit Agreement (including timely provision of reports as required under Section 6.01 thereof) all of which reports shall be provided to the Prepetition Secured Party.

29. In addition to, and without limiting, whatever rights to access the Prepetition Secured Party has under the Prepetition Loan Documents, the Debtor shall permit representatives, agents, and employees of the Prepetition Secured Party to have reasonable access to: (i) inspect the Debtor's assets and properties; (ii) examine the Debtor's books and records, and (iii) discuss the Debtor's affairs, finances, and condition with the Debtor's officers, management, financial advisors, attorneys and consultants, provided, however, that the Debtor shall not be required to disclose to the Prepetition Secured Party information protected by the work product doctrine, the attorney-client privilege or any similar privileges.

65534/0001-44644722v3

30.     Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Collateral Motion should be approved.

**b)     Motion of the Debtor and Debtor-In-Possession for Entry of Interim and Final Orders Authorizing Payment of Prepetition Payroll Obligations, Employee Benefits and Related Items, and the Continuation of Certain Employment Programs and Policies in the Ordinary Course (the "Employee Wages Motion").**

31.     By the Employee Wages Motion, the Debtor seeks entry of an interim and a final Order (i) authorizing, but not requiring, the Debtor to pay outstanding Prepetition Payroll Obligations and Employee Benefits, and (ii) authorizing the Debtor to continue to honor in the ordinary course of its business and perform its obligations under the Health Care Plans, HSAs, Insurance and Disability Plans, PTO Program, 401(k) Plan, and the Additional Employee Benefits.  The Debtor also seeks (a) authorization for its bank to process and honor all checks issued for payments approved by the Employee Wages Motion and, (b) authorization to reissue checks for payments approved by the Employee Wages Motion where the applicable check is dishonored post-petition

32.     As of the Petition Date, the Debtor has 398 employees (the "Employees"), 28 of whom are on salary (the "Salaried Employees") and 370 of whom are paid hourly (the "Hourly Employees").   The Debtor's employee workforce is comprised of 389 restaurant-level employees, who perform functions necessary to prepare and serve food, receive and stock inventory, and handle daily upkeep.  An additional seven (7) employees are Area Directors or Directors of Operation, and two (2) further employees perform maintenance functions.  Seventy-Two (72) of the Employees work full time.  Full-time Employees are those who are regularly scheduled to work at least 30 hours per week (the "Full-Time Employees").  Three Hundred Twenty-Six (326) of the Employees work part time.  Part-time Employees are those who are regularly scheduled to work less than 30 hours per week (the "Part-Time Employees").

65534/0001-44644722v3

33.     The Debtor pays Employees bi-weekly on the Tuesday following each pay period, which begins on a Tuesday and ends on a Monday.  Payments to employees are handled on a centralized basis and with the assistance of a third-party payroll processor, Greenlink Human Capital Management ("Greenlink").  Prior to payday, the Debtor's payroll account is funded with enough money to cover payroll for the pay period.  Greenlink calculates the payroll obligations, handles direct deposits, checks, and pays payroll taxes and other applicable deductions required by law.  Greenlink charges a fee of approximately $1.85 per Employee on a bi-weekly basis for this service, but the Debtor believes that there is no outstanding balance as of the petition date on account of this ordinary course service.

34.     Because the Employees are paid in arrears, as of the Petition Date, the Employees have not been paid all of their prepetition wages.  Specifically, the Employees are not scheduled to be paid until March 28, 2023 for prepetition wages covering the periods March 7, 2023 through March 20, 2023.

35.     As of the Petition Date, the aggregate amount of accrued wages that remain unpaid to the Debtor's Employees is approximately $133,000.00  None of the Employees the Debtor seeks to pay will receive more than the cap under 11 U.S.C. § 507(a)(4)(A).  A schedule of the Prepetition Payroll Obligations is attached to the Employee Wages Motion as **Exhibit C**.

36.     I have been advised that the Unpaid Wages and Employee Benefits that the Debtor seeks to pay with respect to the Unpaid Wages and Reimbursable Expenses are entitled to priority status under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, to the extent they do not exceed $15,150.00 per Employee.  The Debtor would therefore be required to pay these claims in full in order to confirm a chapter 11 plan.

37.     The Debtor also provides certain Employee Benefits such as healthcare insurance.

15

38.     The Debtor operates its business with nearly 400 Employees.  The Employees'

skills, knowledge, and understanding of the Debtor's business are the Debtor's most valuable

asset.  Any disruption in the Debtor's operations from Employee resignations or poor morale

could have significant negative effects on the Debtor's reorganization efforts.  Most of the

Debtor's Employees (and their families) are dependent upon the wages, salaries, reimbursements

and other benefits they receive from the Debtor.

39.     If amounts owed are not paid, insurance reimbursements not made, or other

benefits delayed, Employees may suffer extensive personal hardship and, in some cases, will be

unable to meet the "basic living" needs.  This could cause significant harm to Employees and

their families and potentially make it difficult or impossible for them to continue working for the

Debtor.

40.     I believe that, to avoid the risk of such Employee resignations and to maintain

Employee morale, it is critical that the Debtor be authorized to pay the Employees certain

compensation amounts (subject to the statutory cap) that have been earned under the Debtor's

prepetition contractual obligations or practices.  It is also essential that the Debtor continue the

employee programs and policies discussed in this Motion in the ordinary course of business and

on an uninterrupted basis.  Payment of these obligations and the continuation of the related

programs and policies are essential to maintain employee morale and ensure that the Debtor

retains its employees during this critical period.

41.     In addition, the Debtor requests that all applicable banks and other financial

institutions be authorized and directed to receive, process, honor, and pay all checks presented

for payment and to honor all fund transfer requests made by the Debtor related to the Employee

Wages and Benefits and the Reimbursable Expenses, whether such checks were presented or

65534/0001-44644722v3

fund transfer requests were submitted prior to or after the Petition Date. The Debtor represents that these checks are drawn on identifiable bank accounts. Accordingly, checks other than those for the Prepetition Payroll Obligations, Employee Benefits, and the Reimbursable Expenses will not be honored inadvertently. Moreover, the Debtor represents that it will have sufficient cash reserves to promptly pay all of the Prepetition Payroll Obligations, Employee Benefits and the Reimbursable Expenses, to the extent described herein, on an ongoing basis and in the ordinary course of its business.

42. In sum, the Employees' skills, knowledge, and understanding of the Debtor's operations and customer relations are essential to the continued operations and reorganization of the Debtor's business. Without the continued services of the Employees, I believe an effective reorganization of the Debtor would not be possible.

43. Accordingly, on behalf of the Debtor, I respectfully submit that the Employee Wages Motion should be approved.

c) **Motion of the Debtor and Debtor-In-Possession for Entry of Interim and Final Orders Approving Cash Management System and Authorizing the Debtor to Continue Using Existing Bank Accounts and Business Forms (the "Cash Management Motion")**

44. By this Motion, the Debtor respectfully requests the entry of an interim and a final Order authorizing the Debtor to continue using the Bank Accounts, Credit Cards, and existing Cash Management System, and to continue using the Business Forms substantially in the form existing immediately before the Petition Date, without reference to its status as a debtor-in-possession. The Debtor also seeks authority to require the Banks to permit the Debtor's Chief Restructuring Officer, David Baker, and any Deputy Restructuring Officers appointed by Mr. Baker (the "DROs"), to sign on behalf of the Debtor with regard to all rights and obligations of the Debtor concerning the Bank Accounts and Credit Cards, including, but not limited to, for

65534/0001-44644722v3

purposes of deposits, withdrawals, and charges, and to provide to Mr. Baker and the DROs the same level of access to the Bank Accounts and Credit Cards to which the Debtor is entitled by law or contract.

The Debtor's Cash Management System and Bank Accounts

45.     In the ordinary course of business, the Debtor utilizes an integrated, centralized cash management system typical of fast-food franchises, and comparable to the centralized cash management systems used by other similarly-sized companies to collect, concentrate, and disburse funds generated by its operations (as explained below, the "Cash Management System"). The Cash Management System is tailored to meet the Debtor's operating needs. The Cash Management System enables the Debtor to efficiently collect and disburse cash generated by its business, pay its financial obligations, centrally control and monitor corporate funds and available cash, reduce administrative expenses, and efficiently obtain accurate account balances and other financial data. It is critical that the Cash Management System remain intact to ensure seamless continuation of operations and uninterrupted collection of revenues.

46.     The Cash Management System currently consists of thirty-five (35) bank accounts located at Truist Financial Corporation ("Truist") and other selected banks whose branches are located near the Debtor's various store locations (collectively, with Truist, the "Banks"). A list of the Debtor's bank accounts (collectively, the "Bank Accounts") is set forth on **Exhibit C** to the Cash Management Motion. A schematic diagram of the Cash Management System is attached as **Exhibit D** to the Cash Management Motion.

47.     Each of the Debtor's restaurants (collectively, the "Restaurants," and, each, a "Restaurant") deposit cash proceeds of sales into various depository accounts (the "Depository Accounts"), and from there the funds are swept into the Debtor's operating account (the

18

"Operating Account") on a daily basis from each of the Truist accounts and once per week from each of the other select banks identified on Exhibit C to the Cash Management Motion.

48.     Funds needed to pay employees, to pay vendors, and to meet other operational obligations are funded through the Operating Account.   The Operating Account is maintained at Truist.   All of the Debtor's Bank Accounts are insured by the Federal Deposit Insurance Corporation (the "FDIC").

49.     The Debtor incurs customary monthly banking fees in the approximate amount of $1,000 per month in the connection with the Bank Accounts and, as of the Petition Date, the Debtor does not believe that there are any unpaid prepetition service fees.

50.     The Debtor maintains over 30 Depository Accounts, each of which was selected because it has a branch located near one of the Restaurant locations.   The Depository Accounts are also identified on Exhibit C to the Cash Management Motion.   These Depository Accounts are an important part of the Debtor's cash management system, and if these accounts were closed, the Debtor's collection of funds would be unnecessarily delayed and the administrative burdens on the Debtor would be increased with no offsetting benefit to the Debtor, its estate, or its creditor.   No checks are written from the Depository Accounts.

51.     The Debtor maintains one Positive Pay, Operating Account at Truist.   The Operating Account is funded from the Depository Accounts, as explained above.   The Operating Account is a critical part of the Debtor's cash management system.   If it were closed, the administrative burdens on the Debtor would similarly be increased with no benefit to the Debtor, its estate or its creditors.   Historically, the Debtor has made ACH, check, and wire transfer payments directly from the Operating Account to third parties in the ordinary course of its business.   The Debtor has instructed Truist to remove all pre-authorizations for ACH transfers.

As such, as of the Petition Date, there are no pre-authorized automatic wire transfers, except to fund payroll.

52.     The Operating Account is a "Positive Pay" account. This system is designed to reduce potential fraud and administrative costs associated with cash management by permitting the Debtor to control the payment of checks presented to its bank (the "Positive Pay System"). The Positive Pay System works through a sophisticated system of magnetic coding that is imprinted on each disbursement check issued against the Operating Account. Before Truist can honor any check presented against an account using the Positive Pay system, it must compare critical information magnetically encoded on that check (e.g., check number and amount) to a list of authorized checks that the Debtor electronically transmits to Truist whenever checks are written. Truist will only honor the check if all critical information is successfully verified. Furthermore, the Debtor can receive an electronic transmission from Truist at any time indicating what checks have been presented against the Operating Account.

53.     These key features of a Positive Pay System, while designed as a protection against fraud, can also be used in connection with the Chapter 11 Case to ensure that the Debtor's outstanding, prepetition checks will not be honored subsequent to the Petition Date. Concurrently with the commencement of the Debtor's case, the controller was directed to remove from the Debtor's list of authorized checks all checks then outstanding, and to promptly transmit this updated list, which will reflect no outstanding, authorized checks, to Truist. After this is done, if a check that was outstanding on the Petition Date is presented to Truist for payment, the critical information magnetically encoded on that check will not match any check on the Debtor's list of outstanding, authorized checks, and Truist will be unable to honor that

65534/0001-44644722v3

check. Thus, there is virtually no risk that, if the Operating Account remains open, prepetition checks could inadvertently be honored.

54. The Positive Pay System took significant time to implement, and any disruption thereto would cause substantial harm. It would take several weeks, at minimum, to reestablish the Positive Pay System if the Operating Account were to be closed and reopened. During that time, the Debtor would be required to disburse funds by either issuing wire transfer instructions—which are too costly to be used for most transactions—or to operate without the control features of the Positive Pay System, thereby exposing the Debtor to potential fraud. The resulting disruption to the Debtor's operations could have a devastating effect on its relationship with its vendors. The Debtor's reorganization efforts therefore require that the Positive Pay System to continue essentially intact, and the Debtor is requesting authority to continue using the Operating Account and the Positive Pay System. In accordance with the pending Cash Collateral Motion, the Debtor intends to fund the Utility Account from the Operating Account

55. The Debtor also maintains a controlled disbursement account at Truist, for payment of utilities that are set for auto withdrawal (the "Utility Account"). The Utility Account is funded by transfers from the Operating Account. Any funds remaining in the Utility Account are swept daily back into the Operating Account in amounts necessary to cover the Debtor's business expenditures.

56. The Director of Operations and Assistant Directors are each provided a company credit card that is restricted to use for gas and Restaurant-related expenses (the "Credit Cards"). The Credit Card provided to the Director of Operations has a $3,500 limit and each of the Credit Cards provided to Assistant Directors has a $1,000, but all Credit Cards are limited to the balance available on the corporate account. The Credit Cards are administered through Truist.

65534/0001-44644722v3

## The Debtor's Business Forms

57.     The Debtor utilizes certain correspondence and business forms, such as checks that may be issued from its Operating Account, and other business correspondence (the "Business Forms"), in the ordinary course of its business. Notably, the Business Forms include some preprinted checks.  The Debtor also maintains books and records to document, among other things, its profits and expenses.  The Debtor would incur additional expenses and delay if required to generate new forms, and therefore requests authorization to continue using its Business Forms.

## The Service Charges

58.     The Debtor incurs periodic service charges and other fees owed to the Banks for maintenance of the Debtor's Cash Management System, as well as other service charges and fees from its payment processors (the "Service Charges") in connection with the maintenance of the Cash Management System.  Payment of any pre-petition Service Charges is in the best interests of the Debtor and all parties-in-interest in this chapter 11 case, as it will prevent unnecessary disruptions to the Cash Management System and ensure that the Debtor's receipt of funds is not delayed.

## Continued Use of a Cash Management System and
## Continued Use of Business Forms Is Warranted

59.     The Cash Management System constitutes an ordinary course and essential business practice of the Debtor.  The Cash Management System provides significant benefits to the Debtor including, among other things, the ability to (i) control corporate funds, (ii) ensure the maximum availability of funds when and where necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account information.

22

60.     The operation of the Debtor's business requires that the Cash Management System continue during the pendency of the chapter 11 case.  As a practical matter, because of the Debtor's corporate and financial structure, it would be extremely difficult and expensive to establish and maintain a new cash management system.  Requiring the Debtor to adopt new cash management systems at this early and critical stage of this case would be extraordinarily disruptive and harmful to its operations.  Any such disruption would have a severe and adverse impact upon the Debtor's chapter 11 estate.  In sum, maintaining the existing Cash Management System is in the best interest of all parties-in-interest.

61.     It is my belief that, absent authorization to continue to use the Debtor's existing Bank Accounts, Business Forms, and Cash Management System in the ordinary course of business, significant and unnecessary disruption to the Debtor's business will occur.

62.     Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be approved.

> **d)     Motion of the Debtor and Debtor-In-Possession for Entry of Interim and Final Orders (I) Approving the Adequate Assurance of Payment for Future Utility Services Proposed by Debtor, (II) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Services, (III) Approving Procedures by Debtor for Resolving Additional Assurance Requests, and (IV) Setting a Final Hearing Related Thereto (the "<u>Utilities Motion</u>").**

63.     By this Motion, the Debtor respectfully requests entry of an Interim Order and a Final Order (a) approving the Debtor's proposed form of adequate assurance of postpetition payment to its "utilities" (the "<u>Utility Companies</u>"), as that term is used in section 366 of the Bankruptcy Code; (b) approving Adequate-Assurance Procedures (as defined below) for resolving any objections by the Utility Companies relating to the Proposed Adequate Assurance (as defined below); and (c) prohibiting the Utility Companies from altering, refusing, or

65534/0001-44644722v3

discontinuing service to, or otherwise discriminating against, the Debtor on the basis of the commencement of this Chapter 11 Case (as defined below) or a debt owed by the Debtor for services rendered prior to the Petition Date (as defined below), or on account of any perceived inadequacy of the Debtor's Proposed Adequate Assurance.

64.     Accordingly, on behalf of the Debtor, I respectfully submit that the Utilities Motion should be approved.

> **e)     Motion of the Debtor and Debtor-In-Possession for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities and Statement of Financial Affairs (the "<u>Schedules and SOFA Motion</u>").**

65.     By this Motion, the Debtor seeks entry of an order granting a thirty (30) day extension of the fourteen-day deadline provided by Bankruptcy Rule 1007(c), which will provide the Debtor with a total of forty-four (44) days after the Petition Date to file the Schedules and Statement of Financial Affairs ("<u>SOFA</u>").

66.     The operation of the Debtor's business requires the Debtor to maintain extensive books and records.  As a result of these operational realities and the demand on the Debtor and its professionals to maintain its operations to ensure a smooth transition in the initial stages of the Chapter 11 case, the Debtor and its professionals have yet to complete the Schedules and SOFA, and anticipate that such documents cannot reasonably be completed by the deadline established by Bankruptcy Rule 1007(c).

67.     I have been advised that Bankruptcy Rule 1007(c) provides that the Court may extend the Debtor's deadline to file its Schedules and SOFA "for cause shown."  Here, despite the efforts of the Debtor and its professionals, an extension is necessary for the proper completion of these documents for the reasons set forth below.

65534/0001-44644722v3

68.     I submit that the increased burden placed on the Debtor's organization, the substantial amount of information that the Debtor must assemble and compile, and the number of employee and professional hours required to complete the Schedules and SOFA while managing the operations of the Debtor's ongoing business, all constitute good and sufficient cause for granting the requested extension of time.

69.     Accordingly, on behalf of the Debtor, I respectfully submit that the Schedules and SOFA Motion should be approved.

      **f)**      **Motion of the Debtor and Debtor-In-Possession for an Order (I) Authorizing Debtor to Pay Prepetition Claims of Certain Critical Vendors (the "Critical Vendor Motion").**

70.     In the ordinary course of business, the Debtor purchases goods or services from certain Critical Vendors (as defined below) that, as a practical matter, are the only suppliers that the Debtor can use.  For example. Section 10.11 of the Debtor's franchise agreements with Popeyes provides:

> By signing this Agreement, Franchisee becomes a member of Supply Management Services, Inc. ("SMS"), formerly Popeyes Operators Purchasing Cooperative Association or POPCA, or any successor thereto, and shall remain a member in good standing of SMS throughout the term of this Agreement, and shall pay all reasonable membership fees assessed by SMS.

71.     The Debtor is required to obtain goods or services through the Co-Op.  The goods and services provided by the Critical Vendors, including those in the Co-Op are essential for the Debtor to continue its ongoing operations and to preserve the value of the estate.

72.     The Debtor has reviewed its accounts payable to identify those vendors that are essential to avoid irreparable harm to the Debtor's ongoing operations and its estate.  The following critical vendors have been identified based on a number of factors, including: (i) the nature of the goods or services being supplied and their importance to the Debtor's operations;

65534/0001-44644722v3

(ii) whether the supplier is a "sole source" provider; (iii) whether the Debtor can find an acceptable alternative supplier within a reasonable timeframe; (iv) whether the Debtor has sufficient goods stored or may procure sufficient services in order to continue operations while a replacement supplier is found; and (v) whether failure to pay all or part of a particular supplier's claim could cause the supplier to refuse to ship inventory or to provide essential services on a postpetition basis.

73.     The Debtor has identified the vendors listed below as critical to its operations with these factors in mind.  The Debtor has further taken steps to ensure that any vendors receiving payment of prepetition claims will continue to operate on a postpetition basis in accordance with the terms of the Debtor's prepetition dealings with each Critical Vendor (the "Existing Trade Terms").

74.     By this Critical Vendor Motion, the Debtor seeks entry of an order (a) authorizing, but not directing, the Debtor to pay, in the ordinary course of business, undisputed, liquidated, prepetition amounts owing on account of claims held by Critical Vendors in an amount not to exceed $562,000 and (b) granting related relief.

65534/0001-44644722v3

## **CONCLUSION**

75.     Approval of the Debtor's First-Day Motions is crucial to the Debtor's ability to continue its business.   Without the relief requested, the Debtor would be forced to cease operations and would be unable to pursue its reorganization efforts.   The requested relief will also assist the Debtor in maintaining employee morale, retaining employees, and establishing certain other administrative procedures to promote a smooth transition into, and eventually out of, chapter 11.


        I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 14, 2023

                                                */s/ David M. Baker*
                                                David M. Baker, Chief Restructuring Officer

65534/0001-44644722v3